IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TYRONE C. ROBERSON, | : |
| Plaintiff, | : |
| v. | : Civ. No. 18-061-RGA |
| BARRETTS BUSINESS SERVICES, INC., et al., | : |
| Defendants. | : |

Tyrone C. Roberson, Magnolia, Delaware; Pro Se Plaintiff.

Barry M. Willoughby, Esquire, Young, Conaway, Stargatt & Taylor LLP, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

September 4, 2019
Wilmington, Delaware


ANDREWS, U.S. District Judge:

Plaintiff Tyrone C. Roberson, who proceeds *pro se*, filed this action alleging employment discrimination pursuant to 42 U.S.C. §§ 2000e, *et seq.* (D.I. 2, 5). Before the Court are the parties' cross-motions for summary judgment. (D.I. 23, 24). The motions have been fully briefed.

I.   **BACKGROUND**

Plaintiff, who is African-American, was employed by Defendant Barretts Business Services, Inc. ("BBSI") until his discharge from employment on November 30, 2015. (D.I. 21 at 28). Plaintiff alleges discrimination, based upon race and color, and retaliation, resulting in his wrongful termination. (D.I. 2 at 4).

Plaintiff submitted an application for employment with BBSI on December 22, 2014. (D.I. 26 at 5-6). Defendant Larry Lewis interviewed Plaintiff and offered him a position as an on-site shift supervisor for the night shift at Playtex Energizer, BBSI's client. (D.I. 26 at 22, 44, 82). Lewis supervised Plaintiff. (*Id.* at 82). He also made the decision to terminate Plaintiff's employment on November 30, 2015. (*Id.*).

As an on-site shift supervisor, Plaintiff was expected to supervise on-site staff, conduct customer service, manage the daily shift operations, and ensure that BBSI employees complied with client (*i.e.*, Playtex) rules and regulations. (*Id.* at 82). Plaintiff's assigned work hours were 7:00 p.m. until at 3:00 a.m., making him responsible for supervising part of the second shift and part of the third shift. (*Id.* at 38, 45, 61, 62). According to Lewis, when Plaintiff began working for BBSI, his performance was generally acceptable for a new hire, although he did occasionally

1

display a lack of judgment and, in general, below-average supervisory skills. (D.I. 26 at 82).

In February 2015, Lewis began receiving complaints from Playtex regarding the workers on the third shift, the shift for which Plaintiff was partly responsible. (*Id.* at 83). too was supervised by Lewis.[1] (*Id.* at 80). Brown received complaints from Playtex management regarding Plaintiff's performance and relayed the information to Plaintiff so that Plaintiff could try to solve the problems management was noticing. (*Id.* at 81). Plaintiff testified that in February and March 2015, Brown relayed complaints that included Plaintiff's sleeping on the job, disciplining employees, failing to fill out certain training forms, and not properly handling employees who "were on their phones, they were lollygagging, not doing the job." (D.I. 26 at 48-54; *see also* D.I. 21 at 111-16 (emails in February 2015)). In a February 27, 2015 email, Brown apologized to Plaintiff "for the true lack of training that was given." (D.I. 21 at 6). At the time, Plaintiff did not attribute the complaints to racial animus. (*Id.* at 50).

There was a complaint in June 2015 when Plaintiff met with two Playtex supervisors to discuss a BBSI employee who was accused of sleeping in a car and improperly using a co-worker's identification card to swipe in and out of the building. (*Id.* at 56-57). Plaintiff testified that Brown accused him of lying about the incident. (D.I. 26 at 58; *see also* D.I. 21 at 120-21 (emails in June 2015)). Plaintiff testified that

---

[1] The record shows Brown signing emails as "On-site Account Manager." (E.g., D.I. 21 at 7 (email dated March 17, 2015)). Plaintiff signed his emails as "On-site Manager." (E.g., id. at 2 (email dated Feb. 18, 2015)). The general tenor of the emails included in the record suggest that while Brown was not Plaintiff's direct supervisor, he had some broader or greater responsibility for shift supervision.

2

thereafter, he and Brown had a disagreement following a miscommunication over whether employees were allowed to bring their cell phones into the building, and Brown called Plaintiff incompetent. (*Id.* at 58-60; *see also* D.I. 21 at 118 (email in June 2015)). Plaintiff testified that he found Brown's concerns and criticisms "deceitful," and that Brown tried to blame things on him. (D.I. 26 at 50-51).

Plaintiff also testified that Brown was a liar, he had caught Brown in lies, and that Brown lied to cover himself. (*Id.* at 72). Plaintiff testified that he thought Brown was deceitful in his relationship with him. (*Id.*). Plaintiff decided to work things out with Brown and go forward. (*Id.* at 73). When Plaintiff spoke to Brown during a June 2015 telephone call, he did not tell Brown that he felt Brown had some kind of racial animus against him. (*Id.*).

Plaintiff's hours were changed on August 3, 2015, to begin at 9:00 p.m. and end at 5:00 a.m., making him primarily responsible for supervising the third shift. (*Id.* at 67). After he made the shift change, there continued to be problems with cell phone use, constant turnover, and employees sleeping in their cars. (*Id.* at 68-70). On the morning of August 12, 2015, Brown sent an email to Lewis regarding problems with Plaintiff, suggesting that they need to "sit down and develop a strategy to what we need to do moving forward." (D.I. 21 at 123).

Plaintiff shared a desk with Brown, but they worked different shifts so there was not a lot of face-to-face interaction. (D.I. 26 at 46, 80). Plaintiff left his phone charger in the desk drawer and told Brown that he could use the charger whenever he liked. (*Id.* at 46). Plaintiff testified that explicit racial bias occurred on August 12, 2015. He

3

arrived at work for his 9 p.m. shift and found the cell phone charger cord in the desk drawer had been made into a noose. (*Id.* at 74-76). Plaintiff did not show the noose to anyone. (*Id.* at 47). He first called Vontray Alexander, the third shift manager for Playtex, but she did not answer her phone. (*Id.* at 47). The next morning, Plaintiff sent Lewis a text to talk to him about the "noose incident." (*Id.*). Plaintiff testified that Lewis called him, told Plaintiff that he would look into the situation, and would get back to Plaintiff. (*Id.*). Plaintiff testified that, instead, he received a call from Brown. (*Id.*). Brown understands that Plaintiff "contends" that Brown "left a phone charger cord in the shape of a hangman's noose in the desk [they] shared." (*Id.* at 81). Brown states, "I did no such thing. I never discriminated against [Plaintiff], or anyone else, because of their race." (*Id.*).

Lewis states that he never witnessed any employees harassing Plaintiff. (*Id.* at 83). He states that BBSI has a strong EEO policy and a system in place for making complaints and that Plaintiff was aware of the policy when he signed his anti-discrimination policy. (*Id.*) Lewis states that Plaintiff never made a formal complaint of discrimination. (*Id.*)

Plaintiff testified that other incidents took place between September and November where Brown criticized Plaintiff's performance. (D.I. 26 at 71; *see also* D.I. 21 at 125-28 (emails in September 2015)).

Plaintiff testified that he was neither aware, nor told, of contacts from Playtex to Brown or Lewis complaining about his performance. (*Id.* at 70-71). Plaintiff also testified that he saw notes on the desk he shared with Brown that mentioned "Tyrone

being replaced," and "Tyrone is not doing his job," as well as emails on Brown's BBSI email account that stated, "What are we doing with Tyrone? Tyrone seems to be the problem." (D.I. 26 at 71). Plaintiff testified that there was a "glitch" in the computer that he and Brown shared that allowed Plaintiff to see Brown's emails. (*Id.* at 55). In the later part of his employment, he saw emails from Brown stating that Plaintiff's performance was not satisfactory.[2] (*Id.* at 71-72).

According to Lewis, he worked with Plaintiff by giving him regular feedback and coaching him to try to improve his performance. (*Id.* at 83). Lewis stated that after a certain point, he realized that coaching was not going to make a difference and that Plaintiff lacked the skill set and judgment required of the position. (*Id.*). According to Lewis, Plaintiff was failing in the most important areas he was responsible for, and it was causing "enormous strain on Playtex and the relationship between Playtex and BBSI." (*Id.* at 83). BBSI has no written documentation regarding Plaintiff's performance or counseling reports. (D.I. 21 at 18).

Lewis made the decision to terminate Plaintiff's employment with BBSI due to unresolved performance issues. (D.I. 26 at 83). According to Lewis, at no time did race play any role in this decision. (*Id.*). When Plaintiff was terminated on November 30, 2015, he was "told it was the consensus of Playtex with Joe Brown that [his] services were no longer needed. It was not so much what [Plaintiff had] done, . . . just it didn't work out." (*Id.* at 71).

---

[2] Plaintiff made no mention to Brown that he was reading his emails. (D.I. 26 at 71).

On January 28, 2016, Plaintiff filed a charge of discrimination with the Delaware Department of Labor which was simultaneously dual-filed with the Equal Employment Opportunity Commission. (D.I. 26 at 7). A notice of suit rights issued and Plaintiff commenced this action.

## II.  LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion that a fact cannot be--or, alternatively, is--genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

With respect to summary judgment in discrimination cases, the Court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in

the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Blozis v. Mellon Trust of Delaware Nat'l Ass'n*, 494 F. Supp. 2d 258, 267 (D. Del. 2007) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)). The same standards and burdens apply on cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

Plaintiff moves for summary judgment on the grounds that he was discriminated against based on his race and in retaliation for engaging in protected activity.

Defendants move for summary judgment on the grounds that: (1) Lewis and Brown, as individuals, are not liable under Title VII; (2) Plaintiff cannot establish a prima facie claim of retaliation because he did not engage in protected activity, there is no evidence of causal connection between the alleged protected activity and Plaintiff's employment termination, and the temporal proximity of the alleged protected activity and termination does not establish an inference of retaliation; (3) Plaintiff cannot establish a prima facie case of disparate treatment as to his race discrimination claim, and, even if he could, he is not able to rebut Defendant's legitimate and non-discriminatory reason for terminating Plaintiff's employment.

## III.  DISCUSSION

### A.  Individual Liability

Defendants move for dismissal of Lewis and Brown as a matter of law. Plaintiff did not respond to this ground for summary judgment.

The Complaint names Lewis, Plaintiff's supervisor, and Brown, Plaintiff's co-worker, as defendants. There are no allegations that either were "employers" as required under Title VII. Individual employees cannot be held liable under Title VII. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996). Therefore, the Court will grant Defendants' motion for summary judgment as to the claims against Lewis and Brown.

**B.    Retaliation**

Plaintiff moves for summary judgment on the retaliation claim on the grounds that he established all elements of the claim. (D.I. 23 at 4). Plaintiff contends that retaliation occurred when his employment was terminated on November 30, 2015, following his August 13, 2015 complaint about the noose found in his desk drawer. (D.I. 23 at 1).

Defendants move for summary judgment on the grounds that Plaintiff fails to demonstrate a prima facie case of retaliation and, more particularly, that Plaintiff did not engage in protected activity, and there is no causal connection between Plaintiff's August 13, 2015 report and his subsequent termination. (D.I. 25 at 15-16).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, his employer took an adverse action against him; (3) the adverse action was "materially adverse;" and (4) there was a causal connection between his participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006. A materially adverse employment

8

action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. Whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.*

With respect to the causation prong, the Court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) ("The ultimate question in any retaliation case is an intent to retaliate *vel non*."). In this regard, the Court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450 (cleaned up). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four month period insufficient)).

Plaintiff's retaliation claim revolves around his report to Lewis on August 13, 2015 after he found a cell phone charging cord tied in the shape of a noose in his desk drawer. Plaintiff's position is that his oral complaint is protected activity. Defendants' contend it is not, and argue that the complaint must be specific enough to notify

9

management of the particular type of discrimination at issue. Defendants argue that Plaintiff did not identify that he believed the conduct (*i.e.*, the noose) to be racially motivated.

For purposes of the first element of a prima facie case, protected activity "includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (cleaned up). Here, Plaintiff's communication with Lewis about the noose qualifies at least as an "informal protest" and is therefore protected activity. Given the history of this country and the fact that Plaintiff is an African American who found a noose in his desk drawer, the Court finds Defendants' position a stretch that Plaintiff did not identify that he believed the conduct at issue to be racially motivated and merely made a general complaint of unfair treatment. *See Williams v. New York City Hous. Auth.*, 154 F. Supp. 2d 820, 825 (S.D.N.Y. 2001) ("The . . . noose remains a potent and threatening symbol for African–Americans, in part because the grim specter of racially motivated violence continues to manifest itself in present day hate crimes."). Plaintiff has satisfied the first prong of a prima facie case of retaliation.

The Court turns next to the issue of a causal connection between the August 13, 2015 complaint and the termination of Plaintiff's employment on November 30, 2015. The Court finds that the three-and-a-half month gap between Plaintiff's August 2015 complaint about the noose and the November 2015 termination of employment is too great, without more, to permit an inference of a causal connection. *See Dolan v. Penn*

*Millers Ins. Co.*, 625 F. App'x 91, 94 (3d Cir. 2015) (proximity of three months is not "unusually suggestive," and is insufficient to establish a causal connection). There is no evidence in the record that the August complaint or its subject matter was the subject of any further discussion immediately after Plaintiff reported it. In addition, even when viewing the facts in the light most favorable to Plaintiff, as discussed below at III.D., the record reflects that Plaintiff's employment was terminated based not only upon Lewis' and Brown's observations, but also upon Playtex employees' complaints, none of whom have been identified as having any discriminatory animus.

The Court finds that the evidence of record fails to create a triable issue about the existence of causation. Therefore, Plaintiff cannot make a prima facie showing of retaliation as a matter of law, and the Court will grant summary judgment on the retaliation cause of action.

### C. Hostile Work Environment

Plaintiff moves for summary judgment on the hostile work environment claim on the grounds that he established all elements of the claim. (D.I. 23 at 4). Plaintiff asserts that he faced constant discriminatory actions from Brown and that Brown created a stressful and hostile work environment based upon Plaintiff's race. (D.I. 23 at 1). Plaintiff contends that he reported the noose incident and that Lewis failed to comply with established guidelines to investigate the matter. Plaintiff further contends that Brown created a hostile work environment by continually spreading false rumors about Plaintiff's work performance and harassing him after Plaintiff spoke to Lewis about employment discrimination.

Defendants respond that there is no factual support for Plaintiff's claim that Brown created a hostile work environment by continually spreading false rumors about Plaintiff's work performance. Defendants note that Plaintiff was aware there were concerns about his work performance based upon his claim that Brown was spreading rumors about Plaintiff even if he did not agree the concerns were well-founded. They point out that the work rumors revolved around whether Plaintiff's work performance was satisfactory and there is no evidence the rumors were motivated by race.

To make a prima facie case of hostile work environment, a plaintiff must establish the following five elements: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same race in her position; and (5) there is a basis for employer liability. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996). Not all workplace conduct that may be described as harassment rises to the level of a hostile work environment. *Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006). Several factors inform that determination, such as the severity of the harassment, the frequency of the harassment, and the degree of abuse. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

"Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. at 270-71. Hence, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 271; *see also Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (noting that the standard for judging hostility under Title VII must be sufficiently demanding so that the statute does not become "a general civility code"). Rather, the plaintiff must show that he was subjected to continuous and repeated acts of harassment. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990).

The record contains one incident (*i.e.*, the noose) that a jury could find was racially motivated. The conduct complained of is neither pervasive nor severe enough to satisfy the requirements of a hostile work environment. *See Woodard v. PHB Die Casting*, 255 F. App'x 608, 608-09 (3d Cir. 2007) (affirming grant of summary judgment of no hostile work environment where "racially insensitive comments" of co-workers and burning cross and KKK sign drawn on rest room that was not removed for three months after being reported by plaintiff was insufficient); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432-34 (6th Cir. 2014) (no hostile work environment where plaintiff was subjected to race-based comments and his supervisor stood behind him and made a noose out of a telephone cord).

Plaintiff also argues that Lewis' failure to investigate the incident is evidence of a hostile work environment. However, the failure to investigate does not in itself constitute severe or pervasive conduct. *Chinery v. American Airlines*, __F. App'x__,

13

2019 WL 3334804, at *4 (3d Cir. July 25, 2019). Nor does the failure to investigate show how BBSI's "shortcomings caused a material change in the terms and conditions of [Plaintiff's] employment." *Id.* "Rather, any failure to investigate or discipline" simply "preserved the very circumstances that were the subject of the complaint." *Id.* Finally, while the noose is a symbol of hate and therefore indefensible, there is no evidence of record to suggest that the noose was physically threatening or that it unreasonably interfered with Plaintiff's work performance.

Plaintiff relies upon his subjective beliefs to support his position that he was subjected to a hostile work environment. Plaintiff contends that Brown subjected him to a hostile work environment because Brown was critical of Plaintiff's work performance. Plaintiff testified, however, that at the time the comments were made, he did not believe that Brown's criticism was based on racial animus. Plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact. *See Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229 (3d Cir. 2016). At most, the record reflects that Brown made complaints about Plaintiff's work performance. Even if Brown's complaints may have been inappropriate work behavior, they are not indicative of race discrimination. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998) (Title VII is not a "general civility code."); *see also Barber v. CSX Distrib. Serv.*, 68 F.3d 694, 702 (3d Cir. 1995) (general complaint of unfair treatment does not translate into a charge of illegal discrimination).

After viewing the record, and considering the totality of the circumstances, including the paucity of racially charged incidents that occurred during Plaintiff's

14

employment, the Court concludes that no reasonable jury could find that the claimed harassment was sufficiently severe or pervasive so as to create a hostile working environment. Therefore, summary judgment will be granted in favor of Defendants and against Plaintiff on the issue.

### D. Race Discrimination

Plaintiff moves for summary judgment on the race discrimination claim on the grounds that he established all elements of the claim. (D.I. 23 at 4). Plaintiff contends that he meets the elements of race discrimination and that there are no written documents regarding his performance or counseling reports to support Defendant's position that Plaintiff's employment was terminated due to poor work performance. (D.I. 23 at 3). Plaintiff points to the employee handbook that poor work performance is an offense that warrants progressive discipline including oral and written warnings before termination may result. In addition, he points to Brown's email where Brown admits to a lack of training given to Plaintiff.[3]

Defendants move for summary judgment on the grounds that Plaintiff has failed to establish one of the elements of a prima facie case of discrimination – that his

---

[3] Plaintiff also relies upon the finding of the Delaware Department of Labor of Unemployment Compensation to support his position that his termination was unlawful. (D.I. 23 at 4). Plaintiff, however, conflates two separate proceedings. Different legal standards are used to determine whether to award unemployment benefits based upon finding that an employee was discharged without just cause versus whether an employee has proved the elements necessary to recover for employment discrimination or retaliation in violation of Title VII. *See Haas v. Wild Acres Lakes Prop. & Homeowner's Ass'n*, 2014 WL 980785, at *3 (M.D. Pa. Mar. 13, 2014) (unemployment "referee's decision has no tendency to make the existence of any fact that is of consequence to the determination of plaintiff's Title VII action more or less probable than it would be without the evidence").

termination occurred under circumstances that give rise to an inference of discrimination.[4] (D.I. 25 at 16).

A plaintiff may prove race discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or indirectly through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence" is evidence sufficient to allow the jury to find that "the decisionmakers placed substantial negative reliance on [race] in reaching their decision." *Price Waterhouse v. Hopkins*, 490 U.S. at 277.

A disputed fact is whether Brown made the noose that is central to Plaintiff's claim. Plaintiff asserts he did; Brown is adamant he did not. But the disputed fact is not material. While Plaintiff complains about Brown, the evidence is that the decisionmaker was Lewis, and there is no evidence that Lewis placed any negative reliance on Plaintiff's race in terminating him. Plaintiff has no direct evidence that he was terminated due to his race.

The Court turns to the McDonnell Douglas burden-shifting framework. Under this framework, a plaintiff must first establish a prima facie case of race discrimination by proving that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of

---

[4] Defendants concede the Plaintiff meets the elements that he is a member of a protected class and suffered an adverse employment action. For purposes of this motion only, Defendants concede that Plaintiff was qualified for the position he held. (D.I. 25 at 16).

16

unlawful discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802; *see also Rhoden v. Children's Hosp. of Pittsburgh of UPMC Health Sys.*, 749 F. App'x 86, 88-89 (3d Cir. 2018).

If a plaintiff succeeds in establishing his prima facie case, the burden shifts to defendant employer to proffer "legitimate non-discriminatory" reason for its actions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If defendant meets this burden, the burden again shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id.* at 142-43. To do this, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (cleaned up).

If the defendant meets its "relatively light burden by articulating a legitimate reason for the unfavorable employment decision," the burden of production shifts back to the plaintiff to present evidence from which a reasonable factfinder could infer that the employer's proffered reasons are pretextual. *Id.* To defeat summary judgment at

17

the pretext stage, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764. To survive summary judgment, it is not enough for a plaintiff to simply declare that the reasons proffered by the employer are pretextual. *Id.* at 765. The plaintiff must point to evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id.* (cleaned up).

Assuming arguendo that Plaintiff has established a prima facie case of race discrimination, he has provided no evidence from which a fact finder could either disbelieve Defendants' articulated reasons, or believe that discriminatory reasons were more likely than not the cause of the employment actions. *See Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989) (the non-movant must present affirmative evidence--more than a scintilla but less than a preponderance--which supports each element of her claim to defeat a properly presented motion for summary judgment).

Within a few months after his hire, there were concerns about Plaintiff's work performance. Plaintiff was advised of these performance issues by email and the emails indicate there were attempts to provide Plaintiff with direction on how to improve

18

his performance. In addition, despite the fact there were no written warnings, the evidence of record is that Plaintiff was aware of the work performance issues; both directly and through his surreptitious browsing of Brown's emails.

Nothing before the Court contradicts BBSI's proffered reasons—that Plaintiff's job performance was unsatisfactory--for the actions it took. Nor are its proffered reasons for its actions weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find them unworthy of credence. Finally, "undermining any inference of unlawful discrimination is the fact that [Lewis], the [person] who initially hired [Plaintiff], was responsible for firing [him]." *Vernon v. A & L Motors*, 381 F. App'x 164, 167 (3d Cir. 2010).

As there is no genuine dispute on the dispositive legal issue of whether BBSI had discriminatory motives, the Court will grant Defendants' motion for summary judgment as to the issue of employment discrimination by reason of race.

## IV. CONCLUSION

Based upon the above discussion, the Court will: (1) deny Plaintiff's motion for summary judgment; and (2) and grant Defendants' motion for summary judgment.

An appropriate order will be entered